# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3609

_____

| | | |
|---|---|---|
| Home Builders Association of Greater St. Louis, | * * * | |
| Plaintiff - Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| L & L Exhibition Management, Inc., | * * | |
| Defendant - Appellant. | * | |

_____

Submitted: May 11, 2000

Filed: September 12, 2000

_____

Before BOWMAN, FLOYD R. GIBSON,[1] and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

L&L Exhibition Management, Inc. ("L&L"), appeals the district court[2] judgment that L&L violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by competing

_____

[1]Complications from an automobile accident have prevented Judge Gibson from reviewing this opinion prior to its being filed. The opinion is consistent with Judge Gibson's vote at conference.

[2]The HONORABLE MARY ANN L. MEDLER, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was assigned with the consent of the parties. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b).

unfairly with the Home Builders Association of Greater St. Louis ("HBA") in marketing and presenting home and garden shows in St. Louis. We affirm.

## I. Background

HBA is a nonprofit organization representing the home-building industry in metropolitan St. Louis. HBA members build homes; associate members supply goods and services to home builders. HBA has sponsored home and garden shows in the greater St. Louis area for more than forty years. Since 1981, HBA has held two shows each year, one in the spring called "The St. Louis Builders Home and Garden Show," the other in the fall called "The St. Louis Builders Home and Remodeling Show." The HBA shows are held at the St. Louis Convention Center. The spring show, the largest of its kind in the United States, uses up to 419,000 square feet for more than 500 exhibits. The 1998 spring show drew 60,000 visitors.

L&L is a recently-started Minnesota company that promotes home shows across the country. In 1994, 1995, and 1996, L&L started its first four shows in Minnesota, Colorado, and Indiana. In May 1997, after extensive market research, L&L sponsored its first home show in St. Louis. As it has in other markets, L&L sought to piggyback on the success of the well-established HBA shows. L&L called its show "The Home Improvement & Building Show," a name quite similar to the name of HBA's spring show. L&L marketed its new show as "The St. Louis Home Show," or simply "The Home Show," names that HBA had used in the past and that St. Louis consumers had come to associate with HBA shows. Like the HBA shows, L&L's show was held at the Convention Center, and its advertising suggested it would be a large show. However, by HBA standards, the 1997 L&L show was small, using 80,000 square feet for less than 100 exhibits.

Responding to complaints from visitors who attended L&L's first show thinking it was the more substantial HBA event, Convention Center officials told L&L that

advertising for any future shows would have to identify L&L as the sponsor to prevent public confusion. L&L promoted two more St. Louis shows in January and May 1998. Advertising for these shows identified L&L as the event's sponsor, but only in small print in the written ads, and once very quickly at the end of the television and radio ads. Some visitors to the January 1998 show testified that they attended under the mistaken belief it was an HBA event.

HBA filed this complaint in September 1997, alleging unfair competition and trade dress infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Missouri common law. After a four-day trial, the district court found that HBA's home shows have acquired secondary meaning in the St. Louis market, that L&L's advertising and promotion of its competing shows have confused consumers and building industry exhibitors, and that L&L intentionally created this confusion, as it has done in entering other metropolitan markets, "to trade on the name and goodwill of the pre-existing and well-established show." Based upon these findings, the district court concluded that L&L had violated § 43(a) by engaging in unfair competition. The court entered an injunction ordering L&L (a) to market its St. Louis shows under their full and official names; (b) to print each word of the full name in the same font style and size in all print advertising ; (c) not to market any show as "The Home Show" or "The St. Louis Home Show"; (d) to identify L&L as the show's sponsor in all advertising; and (e) to include the following disclaimer in all advertising: "This is not the St. Louis Home and Garden Show or the St. Louis Builder's Home & Remodeling Show sponsored by the Home Builder's Association of Greater St. Louis." The court further awarded HBA $25,000 in damages plus costs and a reasonable attorney's fee. This appeal followed.

## II. Discussion

Section 43(a) is a remedial provision in the federal Trademark Act of 1946, known as the Lanham Act. Section 43(a) is broadly worded, providing in relevant part:

(1) Any person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any . . . false or misleading representation of fact, which

    (A) is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her . . . commercial activities by another person, or

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's . . . commercial activities,

shall be liable [to] . . . any person . . . likely to be damaged by such act.

15 U.S.C. § 1125(a). The statute has been broadly construed by the federal courts as "making certain types of unfair competition federal statutory torts." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 863 (1982) (quotation omitted); see Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 776-84 (1992) (Stevens, J., concurring). In amending the Lanham Act, Congress has expressed its satisfaction with this judicial approach to construing § 43(a). See SEN. REP. NO. 100-515, at 40-41 (1988), reprinted in 1988 U.S.C.C.A.N. 5577, 5603-04.[3]

Though § 43(a) did not refer to trademarks, service marks, or trade dress until a 1999 amendment, see footnote 4 infra, it is settled that the statute provides a remedy to persons whose trade dress and unregistered marks are infringed or confusingly

_____

[3]HBA's complaint asserted claims under § 43(a) and Missouri law. The district court determined that Missouri unfair competition law follows Lanham Act principles; L&L and HBA agree. However, as a body of federal unfair competition law develops under § 43(a), conflicts between that law and the laws of individual States will be inevitable in other cases. See, e.g., Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997) (New York common law claim requires showing of bad faith; § 43(a) claim does not ).

imitated by others. See Two Pesos, 505 U.S. at 768, 773. Trademarks and service marks are defined in the Lanham Act. For example, a service mark is "any word [or] name . . . used by a person . . . to identify and distinguish [its] services . . . and to indicate the source of the services." 15 U.S.C. § 1127. Trade dress, on the other hand, is a judicially created term. "The trade dress of a product is the total image of a product, the overall impression created, not the individual features." Woodsmith Pub. Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir. 1990). The two are equally protected under § 43(a), see Two Pesos, 505 U.S. at 773, but the parameters of the term trade dress, being entirely non-statutory, can be harder to discern.

L&L's principal argument on appeal is that the trade dress of HBA's home shows is not entitled to protection from unfair competition under § 43(a) of the Lanham Act because that trade dress is entirely "functional." In our view, this argument misdirects the relevant inquiry in two important respects. First, this is not truly a trade dress case, and therefore second, the doctrine of functionality is not seriously at issue.

1. Trade Dress. HBA sent the parties down this wrong path when it alleged, in Count II of its complaint, that L&L has infringed the trade dress of HBA's St. Louis home shows. As the above quote from Woodsmith suggests, trade dress refers to the tangible features of a product or its packaging that create a distinctive image, like the decor of the restaurants at issue in Two Pesos. No doubt a trade show sponsor could identify its show to the public by repeatedly using tangible features that provide a distinct image, such as the shape and style of exhibitor booths. But here, the only trade dress to which HBA refers (other than the show names, which we will discuss in detail in a moment) are the location of the shows and the times of year in which they are held. These are not items of trade dress. Though an adroit imitator may of course use similarity of time and location to increase public confusion as to source, the district court properly rejected HBA's attempt to achieve, through its trade dress allegations, a monopolistic right to put on shows in the Convention Center at particular times of the year. Thus, properly viewed, this is not a trade dress case.

-5-

2. Functionality. It has long been a defense to a claim of trademark or trade dress infringement that the mark or dress is a "functional" feature of the product.[4] The functionality doctrine serves as a buffer between patent law and trademark law by preventing a competitor from monopolizing a useful product feature in the guise of identifying itself as the source of the product. See generally W.T. Rogers Co. v. Keene, 778 F.2d 334, 338-40 (7th Cir. 1985). As the Supreme Court explained in Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 164 (1995):

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation.

"In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Inwood Labs., 456 U.S. at 850 n.10. In other words, a feature is functional "if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex, 514 U.S. at 165. "The fact that the feature at issue serves some function is not enough; to be functional in the trade dress sense, the feature must be necessary to afford a competitor the means to compete effectively." Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 297 (7th Cir. 1998) (quotation omitted).[5]

---

[4]In 1999, Congress amended § 43(a) to expressly provide that a person suing for trade dress infringement "has the burden of proving that the matter sought to be protected is not functional." See Pub. Law 106-43 § 5, 113 Stat. 220, codified at 15 U.S.C. § 1125(a)(3).

[5]The district court defined a "functional" design as one that "performs some function other than identifying the source of the goods," and a nonfunctional trade dress as "an arbitrary embellishment primarily adopted for purposes of identification and

-6-

Viewed with these principles in mind, it becomes apparent that the doctrine of functionality is not truly at issue here. The names of HBA's home shows are not "functional," in the narrow trademark sense of that word, because the name of a trade show does not impact patent law concerns, and HBA's exclusive use of its show names does not prevent the sponsors of competing home shows from competing effectively using other, equally descriptive names. The location and times of the year for HBA shows relate to the shows' function, in the broad sense of the word, but as we have explained, these are not trade dress features, and § 43(a) does not provide HBA the exclusive right to hold home shows in the Convention Center in the spring and the fall.

If this is not a § 43(a) case about trade dress and functionality, then how should it be analyzed? To answer this question, we look more closely at the key identifying feature of an HBA trade show, its name. The names HBA gives its shows are, without question, unregistered service marks -- in the words of 15 U.S.C. § 1127, they are names used by HBA to identify and distinguish its home show services. Section 43(a) protects unregistered marks from infringement and unfair competition. We must classify the strength or weakness of a mark to determine the extent to which it is entitled to Lanham Act protection. A "generic" mark is the common name of a product or service -- "the genus of which the particular product is a species." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985). It may not be registered nor used

_____

individuality and hence unrelated to basic consumer demands in connection with the product." This is too restrictive a view of trademark protection. Before a trademark or trade dress will be denied Lanham Act protection under the functionality doctrine, Qualitex requires a court to find that exclusive use of that feature would put competitors at a *significant* non-reputation-related disadvantage. While there is language supporting the district court's formulation in Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 873 (8th Cir. 1994), and in Prufrock Ltd. v. Lasater, 781 F.2d 129, 133 (8th Cir. 1986), that language must be read in light of the Supreme Court's later discussion in Qualitex and the result it reached in Two Pesos.

exclusively by one competitor, even if it has acquired secondary meaning.[6]   On the other hand, a "descriptive" mark -- one that "describes the qualities or characteristics of a good or service" -- may be registered if it has acquired secondary meaning. Id. at 194.  The other trademark classifications are arbitrary or fanciful and suggestive. These are "strong" marks, because their primary purpose is to identify the source of the product or service, rather than to describe the product or service.  Strong marks are presumptively registrable and entitled to full trademark protection. See Duluth News-Tribune v. Mesabi Publ'g. Co., 84 F.3d 1093, 1097 (8th Cir. 1996).

Some trade show names used by HBA in the past, such as "The Home Show" or "The St. Louis Home Show," might well be generic when applied to this type of show.  See Genesee Brewing, 124 F.3d at 147 (a mark is generic when applied to services "that require the use of the mark in order to convey their nature to the consumer").  But the names HBA now uses, "The St. Louis Builders Home and Garden Show," and "The St. Louis Builders Home and Remodeling Show," are descriptive. They describe the characteristics of the shows, but they also identify the sponsor or source in a way that leaves competitors free to adopt other names that are equally descriptive but not inherently confusing.

Viewed in this light, we have no difficulty concluding that the district court properly granted HBA relief under § 43(a).  The names of the HBA shows are unregistered descriptive marks.  Unless those marks are functional, HBA is entitled to § 43(a) relief upon proof of secondary meaning and a likelihood of confusion or actual confusion.  See Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc., 780 F.2d

---

[6]Secondary meaning is acquired when, in the minds of the public, the primary significance of a mark "is to identify the source of the product [or service] rather than the product itself." Inwood Labs., 456 U.S. at 851 n.11.  In a different § 43(a) context, the Supreme Court recently noted the "relatively great consumer benefit in requiring a demonstration of secondary meaning." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 120 S.Ct. 1339, 1346 (2000).

1324, 1330 (8th Cir. 1985). As we have explained, the marks are not "functional," just as they are not "generic."[7]

Moreover, even if we agreed with L&L that HBA is seeking to protect functional aspects of its trade dress, we reject L&L's contention that a functional trade dress, or a generic trademark, is entitled to *no* protection from unfair competition under § 43(a) *even if it has acquired secondary meaning.* A generic trademark or functional trade dress is not protected from copying. But if it has acquired secondary meaning, § 43(a) relief may be appropriate to require the copier to take reasonable measures to eliminate public confusion as to the source of its competing product or service. See Genesee Brewing, 124 F.3d at 149-50 (generic trademark); WSM, Inc. v. Hilton, 724 F.2d 1320, 1331 n.5 (8th Cir. 1984) (same; dictum); American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1141 (3d Cir.1986) (functional trade dress). This principle is consistent with the common law doctrine of passing off, which § 43(a) was intended to codify. See RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 16 cmt. d (1995), adopted from RESTATEMENT OF TORTS § 741(b)(ii) (1938); J.C. Penney Co. v. H.D. Lee Mercantile Co., 120 F.2d 949, 955-56 (8th Cir. 1941). Compare Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 122 (1938) (no unfair competition in copying plaintiff's distinctive shredded wheat biscuits because there was "no evidence of passing off . . . and [defendant] has taken every reasonable precaution to prevent confusion or the practice of deception in the sale of its product").

In this case, the district court found that HBA's home shows have acquired secondary meaning, that L&L "intentionally attempted to trade on HBA's good will and reputation," that L&L's actions have caused actual confusion among consumers, and that L&L's corrective actions in 1998 were inadequate to end the confusion. L&L mounts no serious challenge to these findings. L&L asserts the only evidence of public

---

[7]The trademark doctrines of functionality and genericness serve essentially the same purpose. See W.T. Rogers Co., 778 F.2d at 338-39.

confusion arose because L&L advertised "The Home Show" and "The St. Louis Home Show," names in which HBA has acquired no secondary meaning. This argument is wide of the mark. L&L violated § 43(a) by advertising its shows in a way that was likely to cause confusion as to origin. HBA proved it has acquired secondary meaning in the descriptive service marks that identify its shows. HBA need not prove secondary meaning in the words L&L used to create the public confusion.

Having carefully reviewed the evidentiary record, we find ample evidence to support these critical district court findings and conclude they are not clearly erroneous. See Conagra, Inc. v. George A. Hormel & Co., 990 F.2d 368, 370-71 (8th Cir. 1993), and Prufrock, 781 F.2d at 132-33 (standard of review). Therefore, HBA is entitled to § 43(a) relief.

Turning to the scope of that relief, L&L argues that injunctive relief is inappropriate because HBA presented no evidence of actual confusion at L&L's third show in May 1998. But numerous witnesses testified they were confused as to the true sponsorship of L&L's first two shows. The district court did not abuse its discretion by entering a limited injunction carefully framed to eliminate the likelihood of confusion at L&L shows in the near future. L&L does not otherwise challenge the scope of the district court's injunction, and it is therefore affirmed. We note that, because of the inherent weakness of HBA's descriptive marks, it is only entitled to injunctive relief that will eliminate public confusion over the sponsorship of L&L's shows. There is always a risk that an injunction of this type will stifle healthy competition if construed too restrictively or left in place longer than necessary. We are confident the district court will guard against that risk should either party hereafter petition the court to vacate or modify its injunction.

L&L also does not challenge the district court's damage award, and that award is affirmed. L&L does challenge the district court's decision to award attorney's fees to HBA. That issue is not ripe for appellate review because a fee award is separate

from the judgment on the merits, and the amount of the award has not yet been determined.  See Budinich v. Becton Dickinson & Co., 486 U.S. 196, 200-01 (1988); In re Modern Textile, Inc., 900 F.2d 1184, 1192 (8th Cir. 1990).

The judgment of the district court is affirmed.  L&L's motion to strike HBA's letter submission of April 22, 2000, is granted because that letter contained argument. See F.R.A.P. 28(j).

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.