# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3410

_____

Gateway, Inc., a corporation,     *
                                   *

         Appellee,     *

                                    *    Appeal from the United States

    v.                              *    District Court for the

                                    *    District of South Dakota.

Companion Products, Inc.,     *

a corporation,                    *

                                    *

         Appellant.     *

_____

Submitted: June 14, 2004

Filed:  September 13, 2004

_____

Before SMITH, BEAM, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Companion Products, Inc. ("CPI") appeals from a final judgment entered in the district court[1] in favor of Gateway, Inc. ("Gateway"), on Gateway's claims of unfair competition and trademark infringement. For reversal, CPI argues that the district court erred in (1) granting Gateway's motion in limine, (2) finding that Gateway's trademark registration was not limited to cow spots in the shape of a box, (3) finding that CPI's product created a likelihood of consumer confusion, and (4) finding that

_____

[1] The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

Gateway's mark was entitled to protection under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 for its trade dress. For the reasons discussed below, we affirm the judgment of the district court.

## I. *Background*

Gateway is a corporation, founded in 1985, based in North Sioux City, South Dakota, that sells computers, computer products, computer peripherals, and computer accessories throughout the world. By 1988, Gateway began its first national advertising campaign using black-and-white cows and black-and-white cow spots. By 1991, black-and-white cows and spots became Gateway's company symbol. Gateway used "Welcome to Gateway Country" and "Gateway Country" as its theme and in association with its stores. In 1992, Gateway registered a black-and-white cow-spots design in association with computers and computer peripherals as its trademark.

CPI, a Colorado company, sells stuffed animals trademarked as "Stretch Pets." Stretch Pets have an animal's head and an elastic body that can wrap around the edges of computer monitors, computer cases, or televisions. CPI produces sixteen Stretch Pets using a variety of animals, including a polar bear, moose, cow, several dogs, and a penguin. Each Stretch Pet has a tag hanging from its ear and a tag sewn into its seam that contains the trademark "Stretch Pets" and the name "Companion Products."[2]

One of CPI's top-selling products is a black-and-white cow that CPI identifies as "Cody Cow." CPI began selling Cody Cow in 1999. CPI has sold approximately

---

[2] CPI advertises and sells its Stretch Pets through flyers, catalogs, the Internet, magazines, independent sales representatives, and phone calls to various retailers. CPI has used the phrase "Welcome to Stretch Pet Country" in some of its advertisements. In retail stores, "Stretch Pets" and "Companion Products" are prominently displayed on each box.

45,000 Stretch Pets and approximately 7,000 of those are Cody Cow. Cody Cow's design and marketing is the catalyst for this case.

Interestingly, Cody Cow's creation is related to Gateway's use of black-and-white cow spots in its advertising. Because Gateway uses black-and-white cow spots in its advertising, CPI's president, Dennis Byer, proposed creating a product for Gateway. Byer considered Gateway an attractive potential customer. Byer produced a document featuring Cody Cow, with a black-and-white cow-spotted design, wrapped around a computer monitor that displayed the wording "an idea for Gateway." On June 1, 1999, CPI sent a sample of the Cody Cow character and a letter to Gateway stating that "our initial sample was a black and white cow designed with Gateway in mind." For its second sample, CPI used a stuffed, black-and-white spotted cow that Byer had bought from a nearby Gateway Country store. Gateway rejected CPI's offer and informed Byer that Gateway had a registered trademark[3] for its black-and-white cow spot design as it related to computers.

The following year, a Gateway employee purchased a Cody Cow Stretch Pet from CPI's website. Based upon its belief that Cody Cow infringed Gateway's

---

[3] The trademark registration certificate depicts a 3-D box with black-and-white cow spots with the accompanying statements:

> For: Computers and Computer Peripherals in class 9 (U.S. CL. 26)
> First use in 4-1-1991; In Commerce 4-1-1991.

> The matter shown by dotted lines on the drawing is not part of the mark and serves only to show the relative position of the mark on the goods.

> The mark consists of a stylized design representing cow spots, consisting of black amorphous shapes on a white background.

Gateway's Registration No. 1,725,231.

trademark, Gateway sent a cease and desist letter to CPI on December 8, 2000. The letter gave notice of Gateway's trademark and warned CPI that if sales of Cody Cow did not cease, Gateway would file suit. Nonetheless, CPI continued production and marketing of Cody Cow. On February 7, 2001, counsel for CPI informed Gateway that Cody Cow did not infringe on Gateway's trademark rights and that it would continue to sell Cody Cow.

Gateway filed suit on April 27, 2001. After resolution of summary judgment motions from both sides, the case proceeded to trial in February 2003 using an advisory jury pursuant to Rule 39(c). The advisory jury returned a verdict in favor of CPI on the issues of trademark infringement, trade dress infringement, and dilution. After reviewing post-trial briefs, the district court agreed with the advisory jury that Gateway failed to prove dilution of its trademark. However, the court concluded that Gateway had established that CPI infringed Gateway's black-and-white cow spots design and its unregistered trade dress in connection with computers. The district court then enjoined CPI from further infringement. This appeal followed.

## II. *Discussion*

The district court granted Gateway judgment under the Lanham Act on its claim for trademark infringement and on its claim for trade dress infringement. Because we find no error in the district court's grant of injunctive relief on the basis of trade dress infringement, we need not address its arguments with respect to trademark infringement. Consequently, we also need not address CPI's argument regarding the district court's grant of Gateway's motion in limine as it pertained specifically to evidence related to the trademark claim.

### A. *Trade Dress Infringement*

CPI urges that the district court erred in finding Gateway's mark to be nonfunctional, and thus protected as trade dress. Specifically, CPI contends that

Gateway's trademark is a functional or ornamental feature of their computer products, and thus Gateway's product is unable to be protected as a trade dress or a trademark.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), creates a federal cause of action for trade dress infringement. *Insty\*Bit, Inc. v. Poly-Tech Industries, Inc.,* 95 F.3d 663, 667 (8th Cir. 1996). "Trade dress is the total image of a product, the overall impression created, not the individual features." *Aromatique, Inc.*, *v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir. 1994) (citing *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990)).

In order for Gateway to establish a claim for trade dress infringement, it must demonstrate that its trade dress is: (1) inherently distinctive or acquired distinctiveness through secondary meaning; (2) nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product. *See Insty\*Bit, Inc.*, 95 F.3d at 667 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)). We review this question of fact under a clearly erroneous standard. *Prufrock Ltd. v. Lasater*, 781 F.2d 129, 132–133 (8th Cir. 1986). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Prufrock Ltd., Inc.*, 781 F.2d at 133 (internal quotations omitted).

First, we agree with the district court that the evidence produced at trial established that Gateway's trade dress acquired distinctiveness through secondary meaning. Secondary meaning occurs when "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000). Gateway produced expert testimony showing that the general public associates black-and-white cow spots in relation to computers with Gateway.

Second, with respect to the next criterion, CPI contends that Gateway's trade dress is primarily functional, and therefore not entitled to protection under the Lanham Act. In order to be protected, Gateway's trade dress must be nonfunctional. *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995). Trade dress is considered functional if it performs some function other than identifying the computers and computer related products that Gateway produces. Our test for determining trade dress functionality provides:

> If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

*Prufrock Ltd., Inc.*, 781 F.2d at 132–133 (citing *Truck Equipment Service Co. v. Fruehauf Corp. (TESCO)*, 536 F.2d 1210, 1217–1218 (8th Cir. 1976)). In short, Gateway's trade dress is nonfunctional "if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality. But if the trade dress is an important ingredient in the commercial success of the product, it is clearly functional." *Id.* at 133. Trade dress may also be considered functional if it puts a competitor at a significant non-reputation-related disadvantage. *Qualitex*, 514 U.S. at 165. *See also Home Builders Ass'n v. L&L Exhibition Mgmt.*, 226 F.3d 944, 948 (8th Cir. 2000).

Gateway's trade dress clearly reflects characteristics that are nonfunctional. Black-and-white cow spots are an arbitrary embellishment that serve only to distinguish Gateway computers from computers produced by other manufacturers.

The purely decorative nature of the design plays no part whatsoever in the performance of Gateway's computers. Surely, no consumer believes that the presence of this design affects the operation of electronic components and peripherals associated with Gateway. Gateway's competitors in the field of computers and their peripherals are not hindered in the least from producing comparable or superior products dressed in some other manner than black-and-white cow spots.

Gateway's trade dress does not prevent CPI from using other colors and designs for their computer-decorative products. They are not placed at a disadvantage to other makers of such products because those companies may not use Gateway's protected trade dress either. CPI produced testimony that collectors of cows prefer cows that have black-and-white spots and that Cody Cow was manufactured for sale to cow collectors. However, the district court made credibility findings regarding Byer's true motives for the production and sale of Cody Cow. Specifically, the court discredited Byer's testimony and found that the product was actually created with Gateway in mind. In sum, CPI may make and sell a collectible cow but it may not sell one like Cody Cow that is specifically identified with Gateway's trademark.

We are satisfied that the evidence presented at trial describes a nonfunctional trade dress. Gateway's witnesses testified that in relation to computers, consumers associated stylized black-and-white cow spots with Gateway. We hold that the district court's finding that Gateway's trade dress is nonfunctional is not clearly erroneous.

Lastly, we address whether Cody Cow creates a likelihood of confusion with Gateway's trade dress. To prevail under the Lanham Act, Gateway had to demonstrate that CPI's use of Cody Cow would likely cause confusion among an appreciable number of consumers. 15 U.S.C. § 1125(a)(1). In determining whether a likelihood of confusion exists, numerous factors must be considered, including: (1) the strength of the trademark; (2) the similarity between the parties' marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse; (5)

evidence of actual confusion; (6) the degree of care reasonably expected of potential customers. *Duluth News-Tribune, a Div. of Northwest Publ'ns, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996). No single factor is dispositive; rather, the factors serve as a guide to determine whether there is a likelihood of confusion. *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980). "Likelihood of confusion is a finding of fact, and therefore, the district court's finding will be upheld unless it is clearly erroneous." *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1329 (8th Cir. 1984).

The district court applied the factors to the evidence in this case and concluded that CPI's Cody Cow is likely to be confused with Gateway's computer products. We agree. In the field of computer products, black-and-white cow spots are clearly identified with Gateway. Gateway's extensive, ten-year advertising campaign to raise the public's recognition of Gateway's mark resulted in consumers associating the black-and-white cow spots with Gateway's computer products. From 1991 through 2001, Gateway spent over $1.3 billion worldwide and over $1 billion in the United States on advertising and promotional items. Gateway Country stores across the nation are painted in a black-and-white cow spotted pattern. Gateway imprints its trademark on a variety of computer accessories and promotional products, including mouse pads and supports, CD binders and sleeves, and screen savers. It sells these products through its catalogs and stores. Gateway ships its computer products in black-and-white cow spotted boxes. The spots on Cody Cow–while not identical to Gateway's cow spots–are nonetheless quite similar.

The district court also made specific findings regarding CPI's intent to confuse. Also noted above, the court questioned the credibility of Byer's testimony. Byer denied that Cody Cow was created for Gateway, even though evidence demonstrated that he had approached Gateway with the idea of the black-and-white spotted cow Stretch Pet before marketing it through CPI. Byer went so far as to send a letter to Gateway indicating that CPI had purchased a Gateway plush cow from a "Gateway

Country" retail store to create the initial sample of Cody Cow. The record shows that CPI intended for Cody Cow to mirror a Gateway plush cow. Also, Byer testified that he thought it would be beneficial to use A & A Plush, the company that manufactured Gateway's plush cows, to create Cody Cow. When Gateway rejected Byer's desire to include Cody Cow in Gateway's collection of merchandise, and informed Byer that Gateway held trademark rights to black-and-white cow spots, Byer did not discontinue sales.

Gateway produced adequate evidence of actual confusion. Gateway conducted a nationwide survey to determine actual confusion. Philip Johnson testified that approximately 39% of the people surveyed erroneously believed that Gateway manufactured or sponsored Cody Cow. This confusion rate substantially exceeds a rate we have previously found sufficient evidence of actual confusion. *Humble Oil & Refining Co. v. American Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) (percentage ranged from 11% to 49%). Johnson testified that in his experience, this represents a high level of confusion. Jamie Hackett, an employee of Gateway until 2001, stated that the black-and-white cow spots on Cody Cow looked similar to the black-and-white cow spots used and trademarked by Gateway. Also, a retail seller of Cody Cow testified that the spots on Cody Cow were similar to the spots used by Gateway.

It is clear from the district court's opinion that the court concluded that CPI and Gateway are in close competitive proximity. The court found that both parties attract people who own computers and who purchase computer accessories. Both sell products in stores and on web sites related to computer goods. CPI's products often appear next to other novelty computer accessories that are similar to Gateway's products. These findings were adequately supported in the record.

Finally, the court considered the degree of care reasonably expected of potential customers. The court found that because Cody Cow sells for less than $20, consumers would not spend substantial time considering their purchase. Consumers

typically exercise little care in the selection of inexpensive items that may be purchased on impulse. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986). Relying on the high degree of similarity between Cody Cow's black-and-white cow spots and Gateway's trade dress, the court concluded that consumers would infer that Gateway is affiliated with CPI's product and would not gather information sufficient to dispel the confusion.

The district court concluded that there was a likelihood of confusion by the consuming public. After evaluating the record before us, we conclude that the district court's findings are not clearly erroneous and should be affirmed.

For all of the above reasons, the judgment of the district court is affirmed.

_____