# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 21-3414

———————————————

Pocket Plus, LLC

*Plaintiff - Appellant*

v.

Pike Brands, LLC, formerly known as Runner's High, LLC, doing business as
Running Buddy

*Defendant - Appellee*

———————————————

No. 22-1304

———————————————

Pocket Plus, LLC

*Plaintiff - Appellant*

v.

Pike Brands, LLC, formerly known as Runner's High, LLC, doing business as
Running Buddy

*Defendant - Appellee*

———————————————

No. 22-1396

———————————————

Pocket Plus, LLC

*Plaintiff - Appellee*

v.

Pike Brands, LLC, formerly known as Runner's High, LLC, doing business as
Running Buddy

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids
_____

Submitted: September 20, 2022
Filed: November 15, 2022
_____

Before GRUENDER, MELLOY, and ERICKSON, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Pocket Plus, LLC, sued Pike Brands, LLC ("Running Buddy") for trade-dress infringement of Pocket Plus's portable pouch. The district court[1] granted summary judgment to Running Buddy and awarded it a portion of its requested attorney fees. Pocket Plus appeals the summary judgment, and both parties appeal the attorney-fees award. We affirm.

**I.**

Pocket Plus sells a portable pouch under the trademarked name POCKET PLUS. The pouch is used for carrying small objects and comes in several sizes, all rectangular in shape and all having a vertical profile (i.e., the pouch is taller than it is wide). Attached to its rear is a narrow magnetic flap that allows the pouch to be

_____

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

-2-

worn on a waistband, around a belt, or hung on handlebars.  *See* Figure 1.  Near the pouch's top edge is a small rectangular tag that includes Pocket Plus's logo.  The tag serves partly as a pull tab to help open the pouch, which can be secured by a Velcro closure.



Figure 1.

Pocket Plus's owner created the POCKET PLUS because she wanted the ability to carry her belongings even when her clothes did not have pockets.  She brought her product to market in 2009 with trade-show appearances, advertising, and promotional materials emphasizing the pouch's ability to hold beverage bottles, cellphones, and other small items.  In her deposition, she testified that the pouch's vertical design is beneficial for carrying items like tools or beverage bottles.  She also testified that the pouch is worn over the waistband "[f]or easy comfort without having a belt" and that "nobody would want to put a lot of bulk inside of their pants."

Pocket Plus is not alone in the portable-pouch market.  Since 2012, Running Buddy has marketed and sold its own pouches under the trademark BUDDY POUCH and related names.  Like the POCKET PLUS, Running Buddy's pouches have magnetic flaps that can be used to attach the pouch to a waistband.  The pouches also come with an illustrative "header card" showing how to use the pouch.  Since 2015, Running Buddy has offered a vertical version, the BUDDY POUCH MINI "PLUS," which is the model at issue here.  *See* Figure 2.  Like Pocket Plus's owner, Running Buddy's managing partner stated that a vertical orientation is useful for

carrying beverage bottles without spilling and that "[a] horizontal orientation would defeat these purposes."



Figure 2.

In 2021, after a series of cease-and-desist letters, Pocket Plus sued Running Buddy for trade-dress infringement under Iowa common law and § 43(a) of the Trademark Act of 1946 (Lanham Act), 60 Stat. 441, as amended, 15 U.S.C. § 1125(a). Running Buddy moved for summary judgment, arguing that the trade dress failed to satisfy two elements of an infringement claim—nonfunctionality and distinctiveness. *See Gateway, Inc. v. Companion Prod., Inc.*, 384 F.3d 503, 507 (8th Cir. 2004). A month later, and within only a few weeks of deposing Pocket Plus's owner, Running Buddy threatened to file for Rule 11 sanctions against Pocket Plus for its weak case. *See* Fed. R. Civ. P. 11. The threat came in a letter to Pocket Plus's counsel with an attached draft motion that sought attorney fees either as a sanction under Rule 11 or as a remedy under the Lanham Act. Running Buddy then moved for leave to file supplemental briefing for summary judgment, asserting that testimony from Pocket Plus's owner "makes abundantly clear that Plaintiff knew the product design was functional and lacked secondary meaning before the Complaint was even filed." Ultimately, Running Buddy did not pursue Rule 11 sanctions.

The district court granted summary judgment for Running Buddy on functionality and distinctiveness grounds. Running Buddy then moved to recover attorney fees, arguing that this was an "exceptional case" under the Lanham Act.

*See* 15 U.S.C. § 1117(a).  The district court found for Running Buddy but awarded only one-fourth of the requested fees.  Both parties appeal the attorney-fees award.  Pocket Plus objects to any award; Running Buddy wants more.

## II.

Pocket Plus appeals summary judgment.  We review a district court's grant of summary judgment *de novo*.  *Ehlers v. Univ. of Minn.*, 34 F.4th 655, 659 (8th Cir. 2022).  "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).

Section 43(a) of the Lanham Act creates a federal cause of action for trade-dress infringement.  *Gateway*, 384 F.3d at 507.  Trade dress typically refers to a product's design or packaging.  *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209-10 (2000).  To prevail on a trade-dress infringement claim, a plaintiff must show that its trade dress is distinctive and nonfunctional and that the trade dress's imitation would result in a likelihood of confusion to consumers regarding its source.  *Gateway*, 384 F.3d at 507.[2]  Pocket Plus's trade dress is unregistered, so it enjoys no presumption of nonfunctionality.  *See* 15 U.S.C. § 1125(a)(3).  Because we find that there is no genuine dispute that the trade dress is functional, we need not address Pocket Plus's arguments that its pouch is distinctive.

### A.

As a preliminary matter, the parties dispute which features make up Pocket Plus's trade dress.  Pocket Plus's definition evolved throughout the litigation, with each iteration more detailed and specific than the one before.  The district court evaluated the trade dress as defined in Pocket Plus's summary-judgment opposition brief:  a portable pocket that (1) is worn externally on a person's clothing, over the waistband on the hip; (2) has a vertical profile with a length at least 1.75 inches

---

[2]Running Buddy did not challenge the likelihood-of-confusion element.

longer than its width; (3) includes a label smaller than one square inch; and (4) is accompanied by an illustration and photographs that emphasize its vertical profile and use on one's hip.

Running Buddy challenges this definition. It argues that two aspects of the asserted trade dress—how the pocket is worn and its range of sizes—cannot be considered part of Pocket Plus's trade dress. Running Buddy is likely correct on both fronts. How a product is worn or used is not part of the "tangible features of [that] product." *Cf. Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Mgmt., Inc.*, 226 F.3d 944, 948 (8th Cir. 2000) (holding that the locations and times of trade shows were not trade dress). As for the asserted size ranges, trade-dress protection arises from actual "use[] in commerce," not potential use. *See* 15 U.S.C. § 1125(a)(1). The asserted ranges encompass more than what Pocket Plus has used in commerce. Nonetheless, we need not resolve whether these aspects are generally cognizable as trade-dress features because Pocket Plus's trade dress is functional with or without them.

B.

To be protectable, trade dress must be nonfunctional. *Gateway*, 384 F.3d at 508. The traditional rule is that a product feature is functional if "it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001). Conversely, a feature is nonfunctional "if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality." *Gateway*, 384 F.3d at 508. The boundary between arbitrary embellishment and functionality is not always clear. *See, e.g.*, *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 860 (7th Cir. 2010) (noting the "chief difficulty [of] distinguishing between designs that are fashionable enough to be functional and those that are merely pleasing"). Aesthetic product features, for instance, may be critical to survival in the marketplace and therefore functional if their protection would put competitors at a "significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 33; *see also Gateway*, 384 F.3d at 508

("[I]f the trade dress is an important ingredient in the commercial success of the product, it is clearly functional."). But where a feature is functional under the traditional rule, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *TrafFix*, 532 U.S. at 33.

Also informing the functionality analysis is whether the trade dress constitutes product design or product packaging. *See Wal-Mart*, 529 U.S. at 213. Product design, unlike product packaging, "almost invariably serves purposes other than source identification." *Id.* These other purposes are often utilitarian and aesthetic. *See id.* Such product designs generally are "subject to copying" absent a patent or copyright. *See TrafFix*, 532 U.S. at 29. Relatedly, some product designs may be too generic or basic to deserve protection because they would "impoverish[] other designers' palettes." *See Franek*, 615 F.3d at 860 (holding that a round beach towel's design was functional); *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997) ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.").

Finally, the functionality analysis focuses on "the collection of design elements, taken as a whole," rather than on "whether individual elements of the trade dress could be categorized as [functional]." *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 673 (8th Cir. 1996); *see also Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 790 (8th Cir. 1995). We emphasize, however, that this approach remains consistent with the notion that trademark law does not protect individual features of a trade dress that are functional. *See TrafFix*, 532 U.S. at 31-34 (analyzing the functionality of the trade dress's "essential feature"). In other words, it is possible for a trade dress to comprise some functional elements and some arbitrary elements so that the trade dress *as a whole* is nonfunctional and eligible for protection, while competitors remain free to copy the functional elements in their own designs. *See Stuart Hall*, 51 F.3d at 790; *see also Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003) ("[I]n order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way.").

Taken as a whole, there is no genuine dispute of material fact that Pocket Plus's trade dress is functional. The pouch's purpose is to carry objects, including beverage bottles and cellphones. A pouch's shape (vertical or horizontal), the ability to open the pouch (pull-tab size and positioning), and how the pouch is worn (around the waist or attached to clothing) all combine to affect its suitability for carrying objects. None of these features are "arbitrary flourish[es]." *See TrafFix*, 532 U.S. at 34. Varying any one affects the usefulness of the pocket in critical ways. *See CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 665 (4th Cir. 2020) (concluding that a feeder pan for chickens was functional because it was the combination of "wholly-functional components").

Pocket Plus argues that the vertical orientation of its pouches is not functional because some competitors make horizontal pouches capable of holding bottles. Similarly, Pocket Plus argues that some competitors make pouches that are worn inside clothing rather than outside. But the question is not whether it is *possible* for alternatives to serve similar purposes. Rather, it is whether that orientation is "essential to the use or purpose of the device" or "affects the cost or quality of the device." *See TrafFix*, 532 U.S. at 33. If it is, then competitors need not explore other design possibilities. *See id.* at 33-34. Pocket Plus's chosen vertical orientation and over-the-hip design undoubtedly affect the quality of a portable pouch and are essential to its purpose.

As for the illustrations and photographs accompanying the packaging, we see no reason why their inclusion in Pocket Plus's trade-dress definition changes the conclusion that its trade dress is functional. Pocket Plus has not pointed to anything unique, unusual, or nonfunctional about the fact that it uses product depictions to inform consumers about its product. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 644-45 (6th Cir. 2002) (noting the unique features in Abercrombie's catalog). Instead, Pocket Plus has simply pointed to a generic marketing idea or concept. Tellingly, its trade-dress definition emphasizes what the depictions *do* rather than what they look like. According to Pocket Plus, the depictions "emphasize[] the vertical profile and use on one's hip." That is

functional. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1002 (2d Cir. 1997) (noting the usefulness of "displaying the actual product to the consumer"); *see also Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1248 (8th Cir. 1990) (holding that a woodworking magazine's easy-to-follow instructions, materials lists, and cutting diagrams are functional and not protectable as trade dress). Further, the record shows that the practice of using product depictions to inform consumers is quite common. *See Woodsmith*, 904 F.2d at 1248 (noting common practices in the magazine industry). Numerous competitors employ depictions to show how to use a pouch and what it might look like when worn. Trademark law "does not protect one from a competitor's imitation of one's marketing concept." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir. 1994).

In sum, there is no genuine dispute that Pocket Plus's trade dress is functional and thus not protected by trademark law. To grant trade-dress protection for Pocket Plus would be to hand it a monopoly over the "best" portable-pouch design. Trademark law precludes that. *See Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 164 (1995) ("The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.").

**III.**

Both parties dispute the attorney-fees award. We review a district court's award of attorney fees under the Lanham Act for abuse of discretion. *Safeway Transit LLC v. Discount Party Bus, Inc.*, 954 F.3d 1171, 1183 (8th Cir. 2020). An abuse of discretion occurs "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a

clear error of judgment." *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1152 (8th Cir. 2011).

Pocket Plus argues that the district court abused its discretion in finding that this was an exceptional case under the Lanham Act warranting an award of attorney fees. Running Buddy argues that the district court abused its discretion in awarding only a portion of the requested fees. We find no abuse of discretion in either decision.

## A.

In "exceptional cases," a district court "may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Whether a case is exceptional is for the district court's discretion, considering the totality of the circumstances. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (interpreting a similar provision in patent statutes); *Safeway*, 954 F.3d at 1182-83 (applying *Octane Fitness* in the trademark context).

"[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 572 U.S. at 554. In other words, the case is "uncommon, not run-of-the-mill." *Safeway*, 954 F.3d at 1182. Relevant factors for a district court to consider include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* (quoting *Octane Fitness*, 572 U.S. at 555). A party's unreasonable conduct need not be independently sanctionable for the case to be exceptional. *Id.* Finally, courts may also consider the prevailing party's behavior in declining to award attorney fees in exceptional cases. *Id.* at 1183.

After briefing and a hearing on the attorney-fees motion, the district court concluded that this was an "exceptional" case due to Pocket Plus's "unreasonable behavior" and the weakness of its litigating position in view of the facts of the case. It found that Pocket Plus's cease-and-desist letters sent before the litigation "unreasonably demanded" action from Running Buddy because the letters did not specify what the trade dress was and instead provided "unreasonably broad" definitions. Considering this context, the district court further found that Pocket Plus acted unreasonably when it changed its trade-dress definition in its opposition to summary judgment, five months after its amended complaint. This change required Running Buddy to undertake additional time, argument, and analysis.

As for Pocket Plus's litigating position, the district court determined that it was "objectively unreasonable on the facts." For support, the district court again noted Pocket Plus's shifting trade-dress definition as well as Pocket Plus's factual assertions that were directly contradicted in the record. Specifically, the district court found that Pocket Plus's arguments for exclusivity were directly contradicted by the several-years' existence of another competitor's pouch. Finally, the district court found that Pocket Plus's assertion that it was entitled to a presumption of distinctiveness was clearly contradicted by evidence in the record regarding another competitor's sales during Pocket Plus's early years.

On this record, the district court did not abuse its discretion in finding that this was an exceptional case. It considered the appropriate law, reviewed the litigation history, held a hearing, and explained its decision.

B.

After finding that this was an exceptional case, the district court declined to award Running Buddy's requested fees for two reasons. First, it reasoned that Pocket Plus's definitional change at summary judgment impacted only part of the litigation, not the whole case. Second, it found that Running Buddy's conduct in threatening to move for sanctions was unreasonable. The district court disapproved

of Running Buddy's "unfulfilled threat of Rule 11 sanctions," which it regarded as "meritless and intended to harass." After conducting a lodestar analysis and reducing the requested hourly billing rate and number of hours, the district court awarded Running Buddy $25,103.75, a quarter of its requested fees.

Running Buddy argues that the district court erred in reducing the fees by relying on Running Buddy's letter threatening to file for Rule 11 sanctions and its subsequent decision not to file. Running Buddy cautions that the district court's logic would have a chilling effect on future Rule 11 motions because a party must provide twenty-one days' notice before filing for sanctions and yet might decide during that period not to file. *See* Fed. R. Civ. P. 11(c)(2); *see also Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1357 (Fed. Cir. 2019) ("[O]ne consideration that can and often should be important to an exceptional-case determination is whether the party seeking fees provide[d] early, focused, and supported notice of its belief that it was being subjected to exceptional litigation behavior." (internal quotation marks omitted and second alteration in original)).

Although we are inclined to agree with Running Buddy that merely not following through on a notice to file Rule 11 sanctions is an insufficient reason to conclude that the threat was meritless, we disagree that the district court abused its discretion in considering that fact along with Running Buddy's letter and draft motion to reduce the fee award. "[A]ll Lanham Act remedies are equitable in nature." *Safeway*, 954 F.3d at 1178. The district court was free to consider both parties' conduct. Although the district court's explanation for why it regarded the threat as meritless and intended to harass could have been more thorough, we find no abuse of discretion.

Running Buddy also challenges the district court's determination of a reasonable billing rate and hours worked. For billing rates, a district court has "great latitude to determine a reasonable hourly rate because it is intimately familiar with its local bar." *Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1172 (8th Cir. 2019). "The burden is on the moving party to provide evidence supporting the rate

claimed." *Wheeler v. Mo. Highway & Transp. Comm'n*, 348 F.3d 744, 754 (8th Cir. 2003). The district court discounted Running Buddy's national-survey evidence because it was not sufficiently probative of reasonable rates in Iowa. Instead, it analyzed a 2008 federal case from the same state and considered defense counsel's experience to reduce the hourly rates from $400, $425, and $480 to $350, which it regarded as "the highest reasonable rate available in the record." Finally, the district court also reviewed the 295.10 hours that Running Buddy billed during the relevant timeframe and reduced the total by less than ten hours for attending a hearing and for time spent on the Rule 11 threat. Neither reduction was an abuse of discretion.

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment and award of attorney fees to Running Buddy.

_____